IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JEFFREY R. LINSCOTT and JL AVIATION,)
INCORPORATED, an Oregon corporation,)
                                    )
          Plaintiffs,               )   Case No. CV05-682-HU
                                    )
     vs.                            )    OPINION AND ORDER
                                    )
VECTOR AEROSPACE, a Canadian        )
corporation; ACROHELIPRO GLOBAL     )
SERVICES USA, INC., a Washington    )
corporation; and ACROHELIPRO GLOBAL )
SERVICES INCORPORATED, f/k/a ACRO   )
AEROSPACE INCORPORATED, a Canadian  )
corporation,                        )
                                    )
          Defendants.               )
_____ )

Michael B. Mendelson
Law Offices of Michael B. Mendelson
888 S.W. Fifth Avenue, Suite 650
Portland, Oregon 97204
     Attorney for Plaintiff

///

James M. Finn
Michael D. Furlong
Schwabe, Williamson & Wyatt
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204
     Attorneys for defendants

HUBEL, Magistrate Judge:

Plaintiffs Jeffrey Linscott and JL Aviation, Inc. bring this action against Vector Aerospace, a Canadian company; Acrohelipro Global Services, a Washington corporation affiliated with Vector Aerospace; and ACRO Aerospace, Inc., and Acrohelipro Global Services, Inc., both Canadian corporations. Plaintiffs assert claims for violation of the Servicemembers Civil Relief Act (SCRA), 50 U.S.C. app. §§ 501-593 (formerly the Soldiers and Sailors Civil Relief Act of 1940, or SSCRA, and collectively referred to as the Act), and common law claims for conversion, breach of warranty, breach of contract, and negligence. Defendants move to dismiss the claims based on the Act and the negligence claim.

## Factual Background

Plaintiffs allege that defendant Vector Aerospace was engaged in the overhaul, maintenance and repair of helicopters, and operated through several corporations, including defendants Acrohelipro Global Services, the Washington corporation, and ACRO Aerospace and Acrohelipro Global Services, Inc., the two other Canadian corporations (Acro). Linscott owned and operated a

helicopter flight service known as JL Aviation, Inc., (JLA), a subchapter S corporation. In 1997, JLA acquired a 1982 Bell Helicopter, called a "Jet Ranger," and in 2001, JLA acquired a 1976 Bell Helicopter called a "Long Ranger." Linscott was personally responsible for the financing of these helicopters. Prior to December 5, 2002, JLA was a profitable corporation, operating the two helicopters and employing two full-time pilots, including Linscott, and three part-time pilots, two maintenance personnel and two fuel handlers.

Linscott was an Air Force Reserve Major assigned as a helicopter pilot to the 939th Rescue Wing based at the Oregon Air National Guard facility. On December 5, 2002, Linscott was ordered to active duty with the 48th Flight Training Squadron stationed at Columbus Air Force Base in Mississippi, to participate in the conversion of the 939th from a rescue squadron to an inflight aerial refueling squadron in the Middle East. Linscott was originally ordered to active duty for the period between December 5, 2002 and June 30, 2003, but his assignment was extended through July 31, 2003.

Martin Russo was a helicopter technical representative engaged in the sale of maintenance and overhaul services. In 1997, Linscott entered into a business relationship with Russo for maintenance of his helicopters. Russo was the western regional representative for Acro. Russo provided JLA with an open

account for maintenance work to be performed with Acro, but there was never a written agreement covering maintenance work performed by Acro for JLA; all maintenance agreements with Acro were made through Russo, "either orally or implied." Complaint, ¶ 4.3

In the summer of 2002, Linscott arranged with Russo for the periodic engine overhaul of the Jet Ranger helicopter. Russo made the arrangements for the overhaul, including obtaining from Acro a leased temporary exchange helicopter engine, providing technical assistance with the removal of the Jet Ranger's engine, and installing the temporary engine. The engine to be overhauled had a fair market value of $20,000.

On August 21, 2002, the Jet Ranger's engine was removed and shipped to the overhaul facility selected by Russo. It is not clear from the complaint whether this overhaul facility was in the United States or Canada, since plaintiffs have alleged that defendants operate six overhaul and repair facilities, two in Canada and four in the United States. A leased, temporary engine from Acro was installed to replace the Jet Ranger's engine while it was being repaired. On November 23, 2002, the overhauled engine was returned to JLA by Acro. JLA and Russo removed the temporary engine and installed the overhauled engine back into the Jet Ranger, but when it was started, the engine developed an oil leak. The engine was shut down and removed. Russo and JLA personnel found the problem and fixed the leak. Russo arranged

for the return of the leased helicopter engine to one of the Acro facilities. However, the newly overhauled engine produced only 95% of rated power at rated altitude.

Because of this, the helicopter engine was not "airworthy" under FAA regulations. Plaintiffs refused to pay for the overhaul until Acro produced an airworthy helicopter engine. On February 17, 2003, while Linscott was on active duty, Russo directed the return of the Jet Ranger's engine to the Acro overhaul facility, promising a quick turnaround so that a temporary engine would not be needed.

Linscott alleges that he did not know Acro intended to keep the engine in order to extract payment for the overhaul and the leased temporary helicopter engine. Plaintiffs allege that Acro knew Linscott was on active duty in Mississippi, and that he had only permitted the engine to go back to Acro because it was not airworthy. Plaintiffs allege Acro knew that, by seizing the Jet Ranger's engine and not providing a temporary replacement engine, they rendered the Jet Ranger inoperable, thereby taking out of commission half of JLA's income-producing equipment, and further hindering JLA's ability to pay Acro or support its own operations.

Once the engine was in its possession, Acro claimed the engine was airworthy and refused to return it to JLA until the outstanding overhaul and other bills were paid. Linscott sent

Acro a copy of his orders and advised them they were in violation of the Act. Acro claimed it was entitled to a lien under Canada's Repairers Lien Act, and that the Act did not apply in Canada.

Plaintiffs allege, on information and belief, that Acro has commenced an action in Canada seeking payment of invoices for the leased engine and for the cost of the overhaul.

Plaintiffs' First Claim for Relief is for violation of § 537 of the Act, alleging that Acro was barred by that provision from interfering with Linscott's right to possession of the Jet Ranger's engine and that it unlawfully asserted a lien on the engine, in violation of § 537(a)(1) of the Act. Plaintiffs seek compensatory and punitive damages for this claim. Plaintiffs' Second Claim for Relief is for violation of § 527 of the Act, alleging that Acro's claim for interest on the unpaid invoices contravenes the protections of §§ 527 and § 523 of the Act, so that the interest ought to be deemed forgiven pursuant to § 527(a)(2). Plaintiffs' Third Claim for Relief is a common law claim for conversion, and seeks compensatory and punitive damages. Plaintiffs' Fourth Claim for Relief is for breach of contract. Plaintiffs' Fifth Claim is for breach of warranty. Plaintiffs' Sixth Claim is for negligence. Plaintiffs seek a declaration of the rights and obligations of the parties under the Act, an injunction precluding Acro from litigating its claims against plaintiffs in Canada, and compensatory and punitive

damages.

## Standards

A motion under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Edwards v. Marin Park, Inc., 356 F.3d 1058, 1061 (9th Cir. 2004). When ruling on a 12(b)(6) motion, the complaint must be construed in the light most favorable to the plaintiff. Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003). The court accepts as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them. Id.; Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991).

## Discussion

Defendants move to dismiss plaintiffs' claims under the Act and the negligence claim. They assert that the claims under the Act are defective because 1) the complaint does not allege the commencement of a judicial or administrative proceeding within the United States or its territories; 2) § 537 of the Act does not provide a private cause of action for damages; 3) plaintiffs have failed to allege sufficient notice of Jeffrey Linscott's military service; and 4) the Second Claim for Relief, seeking a cap on interest under § 523 of the Act, fails because § 523 does not provide such a remedy.

## 1.   Is the Act applicable to this proceeding?

The Act is intended to suspend enforcement of civil liabilities against servicemembers during periods of military service. The purposes of the Act are:

> 1) to provide for, strengthen, and expedite the national defense through protection extended by this Act to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation; and 2) to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service.

50 App. § 502.

The Act is to be "administered as an instrument to accomplish substantial justice which requires an equitable consideration of the rights of parties to the end that their respective interests may be properly conserved." Engstrom v. First National Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).

The provisions of the Act (§§ 501 to 596) apply to 1) the United States; 2) each of the States, including their political subdivisions; and 3) all territory subject to the jurisdiction of the United States, and to "any judicial or administrative proceeding commenced in any court or agency in any jurisdiction subject to this Act." 50 App. § 512(a), (b). Defendants contend that plaintiffs' claims under the Act fail because the complaint does not allege the existence of any "judicial or administrative"

proceeding within the United States or its territories.

Plaintiffs respond that because the Act specifies that it applies to "every possible jurisdiction within the judicial power of the United States," it is "implicit that Congress intended the Act to have paramount application to any entity subject to the jurisdiction of United States courts." They argue that by doing business in the United States, Arco "implicitly subjected itself to American law."

Defendants counter that the complaint alleges merely that Acro has claimed a mechanic's lien on the engine, and, on information and belief, has commenced an action in Canada seeking payment. These allegations, they argue, do not state the conditions necessary for application of the act, which is a "judicial or administrative proceeding" within the United States.

Defendants argue further that plaintiffs have confused the issue of the applicability of the Act with the issue of jurisdiction; the court's personal jurisdiction over the defendants and subject matter jurisdiction over the dispute does not constitute the existence of a "judicial or administrative proceeding."

I conclude that the applicability of the Act encompasses defendants' assertion of a possessory lien for labor expended on the helicopter engine. My conclusion is based on provisions of the Act which deal specifically with liens, and not only their

enforcement, but attempts to enforce them as well.

Section 535 provides, in pertinent part:

(2) No person shall exercise any right to foreclose or enforce any lien for storage of household goods, furniture, or personal effects of a person in military service during such person's period of military service and for three months thereafter....

(3) Any person who shall knowingly take any action contrary to the provisions of this section, or attempts so to do, shall be guilty of a misdemeanor and shall be punished by imprisonment not to exceed one year or by fine not to exceed $1,000, or both.

Section 537 provides, in pertinent part:

**(a)Liens**
> **(1)   Limitation   on   foreclosure   or enforcement**
>> A person holding a lien on the property or effects of a servicemember may not, during any period of military service of the servicemember and for 90 days thereafter, foreclose or enforce any lien on such property or effects without a court order granted before foreclosure or enforcement.
> **(2) Lien defined**
>> For the purposes of paragraph (1), the term "lien" includes a lien for storage, repair, or cleaning of the property or effects of a servicemember or a lien on such property or effects for any other reason.
>> * * *
**(c)   Penalties**
> **(1) Misdemeanor**
>> A person who knowingly takes an action contrary to this section, or attempts to do so, shall be fined as provided in title 18, United   States   Code,   or

> imprisoned for not more than one
> year, or both.
>
> **(2) Preservation of other remedies**
>> The remedy and rights provided
>> under this section are in
>> addition to and do not preclude
>> any remedy for wrongful
>> conversion otherwise available
>> under law to the person claiming
>> relief under this section,
>> including any consequential or
>> punitive damages.

Statutory provisions must be analyzed in the context of the

governing statute as a whole, with the court presuming

congressional intent to create a "symmetrical and coherent

regulatory scheme," <u>Gorbach v. Reno</u>, 219 F.3d 1087, 1099 (9th Cir.

2000); particular phrases must be construed in light of the

overall purpose and structure of the whole statutory scheme.

<u>United States v. Hanousek</u>, 176 F.3d 1116, 1120 (9th Cir. 1999).

Because specific provisions of the Act deal with liens and with

attempts to enforce liens, I conclude that if the defendants

attempted to assert a possessory lien within the United States,

that attempt falls within the statutory term "judicial or

administrative proceeding commenced in any court or agency in any

jurisdiction subject to this Act."

The complaint does not specify where Acro took possession

of the Jet Ranger's engine before asserting the lien, or when

plaintiffs refused to pay for the overhaul of the Jet Ranger's

engine. Consequently, I cannot conclude that plaintiffs could

prove no set of facts under their allegations that would constitute the assertion of a mechanics' lien under the laws of one of the states of the United States, and thus that the Act applies to this case. If the plaintiffs' refusal to pay for the overhaul and the actions of the defendants that constitute assertion of a possessory lien all occurred in Canada, then the Act may be inappplicable. But if plaintiffs' refusal to pay and defendants' possessory actions occurred in Washington or Oregon or another state, then it may well be that plaintiffs can prove the actions alleged constituted the assertion of a lien under the law of one of those states before the engine was taken to Canada, so that the Act applies.

### 2. Does § 537 provide a private right of action for damages?

Section 537 of the Act prohibits the foreclosure or enforcement of liens during any period of military service and for 90 days thereafter, unless through court order granted before foreclosure or enforcement. 50 App. § 537(a)(1). Section 537 also provides that a court may order a stay of proceedings to foreclose or enforce a lien subject to § 537 on its own motion, and must do so if requested by a servicemember whose ability to comply with the obligation resulting in the proceeding is materially affected by military service. Id. at (b). Section 537(c) imposes a misdemeanor criminal penalty for knowing

violation of the section, or attempted violation, and also provides for the preservation of other rights and remedies, including a common law claim for conversion, and any consequential or punitive damages.

Defendants argue that § 537 of the Act does not provide a private right of action for damages, instead providing only that a lienholder may not foreclose on or enforce the lien without court permission. Defendants argue that § 537 does not provide for the recovery of damages, and that § (c)(2) provides only that other rights and remedies are not precluded.

Plaintiffs concede that the issue of whether § 537 of the Act provides a private right of action in and of itself is a question of first impression, but argue that in other cases, courts have inferred a private right of action for violations of other provisions of the Act, including §§ 513, 518, and 526. Plaintiffs rely on <u>Moll v. Ford Consumer Finance Co., Inc.</u>, 1998 WL 142411 (N.D. Ill.); <u>Marin v. Armstrong</u>, 1998 U.S. Dist. Lexis 22792 (N.D. Tex.) and <u>Cathey v. First Republic Bank</u>, U.S. Dist. Lexis 13150 (W.D. La. 2001).

In <u>Moll</u>, plaintiff brought an action alleging that defendant failed to reduce his interest rates during plaintiff's period of active service, in violation of § 526 [1] of the Act.

---

[1] Section 526 prohibits the imposition of an interest rate greater than 6% per year on any obligation or liability incurred by a person in military service while the servicemember is on active

Defendant moved to dismiss, contending that plaintiff had no private right of action under the Act, because § 510 of the Act was enacted to provide only "defensive relief;" thus § 526 only limited the amount of interest recoverable by the creditor in the event the creditor brought an action to enforce the underlying obligation. Defendant argued that § 526 would only provide plaintiff with relief if plaintiff had defaulted on his loan while on active duty and the defendant had then attempted to enforce the obligation. The court disagreed.

The court began by noting that Congress intended that the Act be liberally construed in favor of the military person and administered to accomplish substantial justice, 1998 WL at *2, *citing* LeMaistre v. Leffers, 333 U.S. 1, 6 (1948)(the Act should be read "with an eye friendly to those who dropped their affairs to answer their country's call.") Because the Act does not expressly authorize a private right of action under § 526 or any other provision, the court applied the four-part test of Cort v. Ash, 422 U.S. 66 (1975) to determine whether an implied private right of action exists under the Act. The four-part test in Cort directs the court to consider the following: 1) whether the plaintiff is one of the class for whose special benefit the statute was enacted-- that is, whether the statute creates a

_____

duty, unless the court, upon application by the creditor, determines that the servicemember's ability to pay a higher rate of interest is not materially affected by his military service.

federal right in favor of the plaintiff; 2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; 3) whether a private right of action is consistent with the underlying purposes of the legislative scheme; and 4) whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law. <u>Cort</u>, 422 U.S. at 78.

The court concluded that the four <u>Cort</u> factors favored a private right of action, holding that the legislative history indicated that § 526 was designed to give relief to military persons called into service, and that such relief conferred a benefit on a military person that was not otherwise available to civilians. The court concluded that Congress must have intended that a private right of action be available, because "otherwise the relief would be of no value at all." 1998 WL at *4. The court held that the other three <u>Cort</u> factors also favored a private right of action: first, because § 526 was only available to a person in military service; second, because limiting the amount of interest that could be charged by a creditor was "certainly consistent with the underlying purpose of the Act: to provide military persona with relief in meeting their financial obligations that they incurred prior to active duty," <u>id.</u>, and third because the Act did not provide relief typically relegated

to state law because it was grounded on "Congress' right to raise and maintain armed forces of the United States." <u>Id.</u>

The <u>Cathey</u> case involved an action based on alleged violations of §§ 518 and 526. The court agreed with and adopted the reasoning of <u>Moll</u> and <u>Marin</u>.

In the <u>Marin</u> case, plaintiff's action was based on his request that his obligations under an installment contract be tolled for a period of illness caused by military service. The court held that private rights of action existed under §§ 518 and 531 of the Act, because without a private right of action, a creditor could ignore the provisions of § 531, with the only penalty for violation being the imposition of a criminal fine or imprisonment as provided in § 531(2). As the court noted, "[s]uch criminal penalties provide no relief to the service member on behalf of whom the statute was enacted. A result that fails to make the service member whole defies the purpose of the statute." 1998 U.S. Dist. Lexis * 12.

The <u>Marin</u> court also found an implied right of action in § 518 of the statute, because § 518 confers a right upon service members that is not enjoyed by the public at large. Further, the court held, without a private cause of action "there would be no way for a service member to ensure that his rights were protected under the section," because creditors could "simply ignore the provisions of the section without repercussion." The court

concluded that because § 518 failed to provide a specific enforcement mechanism, "just as with § 526, Congress must have intended to confer a private cause of action upon service members." Id.

The reasoning of these cases is applicable here. Under the Cort analysis, "[t]he most important inquiry ... is whether Congress intended to create the private remedy sought by the plaintiffs." Suter v. Artist M., 503 U.S. 347, 364 (1992). See also Thompson v. Thompson, 484 U.S. 1274, 1279 (1988)("In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute."); First Pacific Bancorp, Inc. v. Helfer, 224 F.3d 1117, 1121-22 (9ᵗʰ Cir. 2000)(noting "some suggestion that Cort has been overruled," with "legislative intent" subsuming the other three factors).

The legislative intent factor clearly favors plaintiffs. There is no indication that in enacting and renewing the Act, Congress intended to create rights without remedies. As the court observed in Cathey,

> It would lead to an absurd conclusion to say that the Congress enacted a fairly elaborate legislative scheme to protect service members in a variety of ways and then throw their claims out of federal court when they sued to enforce their rights and collect damages [for] violation of their rights. ...

2001 U.S. Dist. Lexis 13150 *17. Applying the other three Cort

factors, plaintiff is clearly a member of the class for whose benefit the statute was enacted. Moreover, the provision of § 537 stating that the remedy and rights provided by that section are "in addition to and do not preclude any remedy for wrongful conversion otherwise available under law ... including any consequential or punitive damages," indicates that Congress did not intend to explicitly deny servicemembers the remedy of damages for violation of this provision, and that damages are consistent with the underlying purposes of the statute. And finally, as the court observed in <u>Moll</u>, the cause of action is not one traditionally relegated to state law because the Act was grounded in Congress's right to raise and maintain armed forces within the United States.

I conclude that a private right of action should be implied in § 537 of the Act.

### 3. Failure to allege compliance with the notice provisions of § 527(b)

Defendants assert that even if the court were to find the Act applicable, plaintiffs fail to state a claim for protection under the interest rate cap of § 527. In order for § 527 to apply, Linscott was required to provide the defendants with written notice and a copy of his military orders within 180 days after his termination or release from military service. 50 U.S.C. app. § 527(b)(1).

Plaintiffs respond that they have alleged Linscott sent Acro a copy of his orders while he was on active duty, but that he can amend the complaint to specify that a copy of the orders was provided to the defendants, or at least one of them, within the required time. Plaintiffs are given leave to amend the complaint to allege, if they can in good faith, that Linscott provided defendants with written notice and a copy of his military orders within 180 days after his release from military service.

### 4. Interest rates cap not available under § 523

Plaintiffs' Second Claim for relief alleges that they are entitled to a cap on interest rates provided by the Act, but they mistakenly rely on § 523 of the Act. Plaintiffs request leave to amend the complaint to correct the error. The request is granted.

### 5. Negligence claim

Defendants move against the negligence claim on the ground that plaintiffs cannot recover damages for negligence because, under Oregon law, plaintiffs are limited to their alleged contractual remedy. A tort action between parties to a contract arises only when the plaintiff's damages result from breach of an obligation that is independent of the terms of the contract, usually because a special relationship between the defendant and the plaintiff gives rise to an obligation imposed by law. See Jones v. Emerald Pacific Homes, 188 Or. App. 471, 476 (2003).

Defendants point out that plaintiffs have alleged the existence of a contract between themselves and the defendants for repair of the engine, but that they also allege negligence based on defendants' alleged failure to exercise reasonable care in its work on the engine. However, they have not alleged a special relationship, and there is no indication that such a relationship exists. No special relationship exists under Oregon law for parties who contract with each other at arms length in a business situation. Uptown Heights Assoc. Ltd. Partnership v. SeaFirst Corp., 320 Or. 638, 649-50 (1995).

Plaintiffs counter that their negligence claim is actually a claim for product liability, because the complaint alleges that the rebuilt engine damaged Linscott's property and was unreasonably dangerous.

Defendants argue that product liability claims can be asserted only against manufacturers, distributors, sellers, or lessors of a product. Or. Rev. Stat. § 30.900; Russell v. Ford Motor Co., 281 Or. 587, 590 (1978). The complaint alleges only that defendants are engaged in the repair and overhaul of helicopters.

Defendants argue further that plaintiffs have failed to allege damages for personal injury, death or property damage arising out of a product liability claim, as provided by Or. Rev. Stat. § 30.900. Rather, the complaint alleges damages flowing

from loss of use of the engine. Such damages are not recoverable in a product liability action.

I agree with defendants that plaintiffs have not properly pleaded a claim for negligence. Accordingly, that claim is dismissed.

## Conclusion

Defendants' motion to dismiss (doc. # 10) is DENIED in part and GRANTED in part.

IT IS SO ORDERED.

Dated this 31st day of January, 2006.


/s/   Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge