IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JEFFREY R. LINSCOTT and JL AVIATION,)
INCORPORATED, an Oregon corporation,)
                                     )
          Plaintiffs,                )  Case No. CV05-682-HU
                                     )
     vs.                             )    OPINION AND ORDER
                                     )
VECTOR AEROSPACE, a Canadian         )
corporation; ACROHELIPRO GLOBAL      )
SERVICES USA, INC., a Washington     )
corporation; and ACROHELIPRO GLOBAL )
SERVICES INCORPORATED, f/k/a ACRO    )
AEROSPACE INCORPORATED, a Canadian   )
corporation,                         )
                                     )
          Defendants.                )
_____)

Michael B. Mendelson
Law Offices of Michael B. Mendelson
888 S.W. Fifth Avenue, Suite 650
Portland, Oregon 97204
     Attorney for Plaintiff

///


1  - OPINION AND ORDER

James M. Finn
Michael D. Furlong
Schwabe, Williamson & Wyatt
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204
     Attorneys for defendants

HUBEL, Magistrate Judge:

     This is an action by Jeffrey Linscott and JL Aviation, Inc.
(JLA) against Vector Aerospace, a Canadian company, and its
subsidiaries Acrohelipro Global Services USA, a Washington
corporation, and Acro Aerospace, Inc., a Canadian corporation.
Plaintiffs assert claims for violation of the Servicemembers
Civil Relief Act (SCRA), 50 U.S.C. app. §§ 501-593 (formerly the
Soldiers and Sailors Civil Relief Act of 1940, or SSCRA, and
collectively referred to as the Act), and common law claims for
conversion, breach of warranty, breach of contract, and
negligence.

     The matters before the court are plaintiffs' motion for
preliminary injunction (doc. # 20), defendants' motion to strike
(doc. # 25), and defendants' motion for summary judgment (doc. #
27). The motions for preliminary injunction and for summary
judgment arise from a default judgment obtained by Acro against
JLA in the Supreme Court of British Columbia, Canada on June 24,
2005 (the Canadian judgment), which ordered JLA to pay Acro
$106,074.90 USD and $500 in costs. On October 21, 2005,

///

defendants notified plaintiffs of their intent to register the judgment in Oregon.

Defendants move for summary judgment in their favor on the ground that the judgment entered by the Canadian court has *res judicata* effect which precludes the assertion of the plaintiffs' claims in this action. Plaintiffs move the court for a preliminary injunction enjoining defendants from taking any action to enforce the Canadian judgment.

### Factual Background

Defendant Vector Aerospace is engaged in the overhaul, maintenance and repair of helicopters, and operates through several corporations, including Acrohelipro Global Services, a Washington corporation, and Acro Canada, based in Richmond, British Columbia. Plaintiff Jeffrey Linscott owns and operates JLA, a subchapter S corporation which provides helicopter flight services. JLA owned a 1982 Bell Helicopter, called a "Jet Ranger," and a 1976 Bell Helicopter called a "Long Ranger." Linscott was personally responsible for the financing of these helicopters.

Martin Russo had provided helicopter maintenance services to JLA since 1997, throughout his employment with three separate entities, the last of which was Acro. At the times relevant to this action, Russo was a United States regional manager for Acro. Russo provided JLA with an open account for the maintenance work

to be performed by Acro, but it appears that there was never a written agreement governing maintenance work provided to JLA by Acro. All maintenance agreements between JLA and Acro were made through Russo, either orally or implied.

In June 2001, JLA overhauled a compressor for JLA. JLA's payment for the work was made to Acro.

In August 2002, Linscott, Russo, and James Delaney, JLA's director of maintenance, discussed the overhaul of a turbine on the engine of the Jet Ranger helicopter. JLA requested a cost estimate for the overhaul. When Linscott told Russo he thought the estimate was too high, Russo was able to get the cost reduced. On August 19, 2002, Acro shipped a rental turbine to JLA from the Richmond facility in Canada to replace the turbine JLA intended to send to Acro for overhaul. On September 3, 2002, Russo faxed Delaney a Canadian customs form and Delaney shipped JLA's turbine by Federal Express to Acro at the Richmond facility. Acro received the turbine on September 5, 2002. Acro sent JLA a Customer Estimate dated October 24, 2002, estimating a total cost for the turbine's overhaul of $55,813.15, which Delaney signed, dated and returned to Acro.

Acro overhauled the turbine, invoiced JLA $55,813.15, and returned the turbine to JLA on November 21, 2002. Russo and JLA personnel removed the temporary turbine provided by Acro and installed the overhauled turbine into the Jet Ranger. On November

4    - OPINION AND ORDER

24, 2002, Delaney called Russo about an oil leak that had developed in the engine which was coupled with the turbine overhauled by Acro. Linscott apparently left Russo a voicemail message about the leak sometime before that. Russo went to JLA's facility and assisted Delaney with a repair to the number eight scavenge fitting.

In late November or early December, Delaney contacted Russo again to tell him the engine/turbine combination was producing only 95% of rated power at rated altitude, which made it not airworthy under FAA regulations.

Linscott was an Air Force Reserve Major assigned as a helicopter pilot to the 939th Rescue Wing based at the Oregon Air National Guard facility. On December 5, 2002, Linscott was ordered to active duty with the 48th Flight Training Squadron stationed at Columbus Air Force Base in Mississippi. Linscott was originally ordered to active duty for the period between December 5, 2002 and June 30, 2003, but his assignment was extended through July 31, 2003. Acro was aware that Linscott was away on active duty.

In early February 2003, Delaney told Russo JLA was returning the turbine to Acro because JLA suspected that the turbine was responsible for the low engine power. In mid-February, Delaney returned the turbine to the Richmond facility
///

and requested that Acro determine whether it was operating correctly.

On February 26, 2003, Acro reported to JLA that its tests showed the turbine performed at full power when installed in its helicopter engines. Acro demanded payment from JLA. The evidence is conflicting on whether JLA was informed by Acro that it would keep the turbine until JLA paid for the repairs. Russo's activity log indicates that Acro knew it could not sue Linscott while he was on active duty because of the Act, but also knew it could invoke its rights under the Canadian Repairers' Lien Act because it had physical possession of the engine, and that Linscott would need the turbine to run his business. See Exhibit 2 to Russo Deposition, p. 200.

It also appears from Russo's activity log that Linscott was simultaneously offering assurances that he would pay what JLA owed to Acro and insisting that the turbine was not operating at full power. On June 14, 2003, Linscott's attorney, William Lewis, sent a letter outlining Linscott's rights under the Act and stating that Linscott expected to be back in the United States by July 1, 2003. Mendelson Affidavit, Exhibit 4. The letter also states that the quality of Acro's work on the turbine is "in question." Id.

On October 14, 2003, after Linscott returned from active duty, Acro advertised the turbine for sale in a British Columbia

6   – OPINION AND ORDER

newspaper pursuant to the Repairer's Lien Act, but did not sell it. Over the next two years, Acro continued to demand payment from JLA. Acro filed an action in the Supreme Court of British Columbia on March 14, 2005, demanding payment, interest at the rate of 18% per year, and costs. JLA, but not Linscott, was served with a summons in that action on March 24, 2005. Affidavit of Michael Furlong, Exhibit 1, Exhibit 3. A final order was entered in the Canadian action against JLA on Friday, June 24, ordering JLA to pay Acro "the amount in Canadian Currency that is necessary to purchase the equivalent amount of $106,074.90 USD" and $500 in costs. Furlong Affidavit, Exhibit 4.  On October 21, 2005, plaintiffs' counsel received a copy of the Canadian judgment, along with notice of its intent to register the Canadian judgment in Oregon.

### Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### Discussion

1.   <u>Plaintiff's motion for preliminary injunction</u>

The party seeking a preliminary injunction must show either

(1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in the movant's favor. A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001). While stated as alternatives, these formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. A & M Records, 239 F.3d at 1013.

Plaintiffs argue that they have a strong likelihood of success because the court has previously held possessory liens are encompassed within the Act, and because Acro's judgment for 18% interest is in direct violation of § 526 of the Act, which limits interest charges to 6% per year during the period of active service. Plaintiffs assert that the irreparable harm factor also weighs strongly in their favor, pointing out that an injunction would maintain the status quo and allow the parties to have all their claims adjudicated in a single forum.

Before I can apply the test for a preliminary injunction, I must first determine whether this court has authority to enjoin the defendants from enforcing, in the United States, a judgment rendered by the Canadian court.

In arguing that it does, plaintiffs rely on Seattle Totems Hockey Club, Inc. v. The National Hockey League, 652 F.2d 852 (9th

Cir. 1981). In <u>Seattle Totems</u>, the court adopted the reasoning of the Fifth Circuit in <u>In re Unterweser Reederei Gmbh</u>, 428 F.2d 888 (5th Cir. 1970), *rev'd on other grounds sub nom.* <u>Bremen v. Zapata Off-Shore Co.,</u> 407 U.S. 1 (1972). In <u>In re Unterweser</u>, the Fifth Circuit held that foreign litigation may be enjoined when the foreign litigation would 1) frustrate a policy of the forum issuing the injunction; 2) be vexatious or oppressive; 3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or 4) prejudice other equitable considerations.

The <u>Unterweser</u> court noted, "Though a domestic court has no power to restrain the courts of a foreign nation, it has admitted power to deal with litigants properly before it. An exercise of the latter power is not the assumption of the former." 428 F.2d at 892. I understand this statement to mean that authority to enjoin foreign litigation encompasses the power to prevent the enforcement of a foreign judgment in the United States.

It is apparent that the Canadian judgment obtained against JLA implicates one of the four considerations set out in <u>In re Unterweser</u>, because the Canadian judgment includes interest at the rate of 18% per annum during the period that Jeffrey Linscott was on active duty, in contravention of the Act's provision limiting the interest charged a servicemember to 6% per year during the period of active duty. 50 U.S.C. app. § 526. The Canadian judgment therefore frustrates the United States' policy,

implemented by the Act, of granting certain protections to servicemembers on active duty in order to enable them to devote their entire energies to the defense needs of the nation. See 50 U.S.C. app. § 502.

Defendants have argued that the protections offered to servicemembers by the Act are not applicable to JLA, the judgment debtor. However, I am persuaded by the reasoning of the court in Cathey v. First Republic Bank et al., 2001 U.S. Dist. Lexis 13150 (W.D. La. 2001), which held that the protections extended to the servicemember by the Act extend to the servicemember's family corporation, especially when, as in Cathey and as in this case, the corporation's obligations were personally guaranteed by the servicemember and the corporation "depend[ed] on its owners' presence for profitability." Id. at *14.

The 18% interest rate cannot be severed from the Canadian judgment, because the judgment was rendered as a single sum of money, i.e., "the amount in Canadian Currency that is necessary to purchase the equivalent amount of $106,074,90 USD at a chartered bank located in British Columbia ... with reference to the Bank's quote for such an amount on the last day of business before the Defendant makes a payment pursuant to this order."[1]

---

[1] The plaintiff's claim to the Canadian court is set out as Exhibit 2 to the Furlong Affidavit, and shows that $73,981.14 USD is demanded for goods and services sold and $29,374.73 USD is demanded as interest, along with per diem interest of $36.28 USD from March 1, 2005 to the date of judgment, or "in addition or in

There is no clear way to calculate the interest which the SCRA allows to be charged to plaintiff as distinguished from the amount in the judgment defendants seek to enforce. Because the Canadian judgment is "tainted" by the 18% interest rate, it frustrates an important policy of the United States. This court therefore has the authority to enjoin defendants' attempts to enforce the judgment in this jurisdiction.

For the reasons discussed, and for additional reasons discussed below, I also conclude that plaintiffs have a strong likelihood of prevailing on the merits, and that the balance of hardships tips strongly in their favor.

2.  <u>Defendants' motion for summary judgment</u>

The defendants urge me to find that the default judgment entered by the Canadian court has *res judicata* effect which precludes the assertion of counterclaims in a subsequent proceeding in the United States. Defendants rely on <u>Bank of Montreal v. Jack Kough</u>, 612 F.2d 467 (9th Cir. 1980).

In that case, the Bank of Montreal obtained a default judgment against Kough in British Columbia. Kough was a minority shareholder of Arvee Cedar Mills, Ltd., a British Columbia corporation situated and doing business in that province. Kough was also an officer and member of the Board of Directors of

---

the alternative, interest pursuant to the Court Order Interest Act (R.S.B.C. 1996) c. 79. Costs are also demanded.

Arvee, which did business with the Bank of Montreal. Kough had entered into a guarantee agreement, executed in British Columbia after several meetings of negotiation in the province, whereby he and another individual agreed to guarantee the payment of all present and future debts of Arvee to the extent of $718,000 plus interest from date of demand for payment, in consideration of the Bank's agreement to continue to do business with Arvee. Arvee defaulted and Kough defaulted. The Bank then brought an action in the Supreme Court of British Columbia for breach of contract. Kough was personally served in California. Kough did not appear in the British Columbia action and a default judgment was entered against him.

The Bank then commenced an action for a foreign money judgment against Kough in the district court for the Northern District of California. Kough filed an answer in which he denied that the Canadian judgment was duly rendered, claiming that he neither appeared, nor was served with the original process or summons in British Columbia, and asserting four counterclaims.

The Kough court began by noting that recognition and enforcement of the Canadian judgment depended upon the proper construction of the Uniform Foreign Money Judgments Recognition Act adopted by California.

The court concluded that the Canadian judgment would be recognized pursuant to the California statute, as long as

American due process standards were not offended by the Canadian court's assertion of personal jurisdiction over Kough. In reaching this decision, the court noted the Supreme Court's decision in <u>Kulko v. Superior Court of California</u>, 436 U.S. 84, 91-92 (1978), where the court held that a constitutionally valid judgment which is entitled to full faith and credit in sister states may be entered by a state court as long as there is "a sufficient connection between the defendant and the forum state as to make it fair to require defense of the action in the forum," and provided that the defendant has received "reasonable notice" of the proceedings against him. The <u>Kough</u> court concluded that the California statute was intended to leave the door open for the recognition by California courts of foreign judgments, as well as judgments from other states.

The <u>Kough</u> court determined that due process principles were satisfied in its case, with respect to both minimum contacts with the forum state and adequate notice. The court found that Kough did have substantial contacts with British Columbia, not only through the execution and breach of the guarantee there, but also because of prior negotiations in British Columbia involving the guarantee, and by other promissory notes to the Bank executed earlier.

///

///

13  - OPINION AND ORDER

Applying the analysis of <u>Kough</u>, I turn first to the question of whether due process principles would be satisfied under the facts of this case.

Clearly, the assertion of general jurisdiction over JLA and Linscott by the Canadian court would not comport with United States standards of due process, since general jurisdiction exists when a defendant is domiciled in the forum state or his activities there are "substantial" or "continuous and systematic." <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414-16 (1984). For a business entity, the contacts must constitute the kind of continuous and systematic general business contacts that "approximate physical presence." <u>Bancroft & Masters, Inc. v. Augusta Nat'l Inc.</u>, 223 F.3d 1082, 1086 (9th Cir. 2000). Such contacts do not exist between JLA and British Columbia.

> To be subject to specific jurisdiction:
>
> (1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or residents thereof; or perform some act by which he purpose-fully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws;
>
> (2) the claim must be one that arises out of or relates to the defendant's forum-related activities [and];
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice; i.e. it must be reasonable.

<u>Lake v. Lake</u>, 817 F.2d 1416, 1421 (9th Cir. 1987).

The purposeful availment requirement ensures that a nonresident defendant will not be haled into court based upon "random, fortuitous or attenuated" contacts with the forum state. <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985). This requirement is satisfied if the defendant "has taken deliberate action" toward the forum state. <u>Panavision Intern., L.P. v. Toeppen</u>, 141 F.3d 1316, 1320 (9th Cir. 1998). However, the contacts must proximately result from actions by the defendant himself that create a substantial connection with the forum state. <u>Burger King</u>, 471 U.S. at 475; <u>Glencore Grain v. Shivnath Rai Harnarain</u>, 284 F.3d 1114, 1123 (9th Cir. 2002).

Acro argues that JLA had "substantial contacts" with British Columbia because 1) JLA shipped helicopter parts to Canada, including the turbine; 2) JLA was invoiced by documents displaying Acro's British Columbia address; 3) JLA sent payment to Acro in British Columbia; and 4) Jeffrey Linscott "admits that he was conscious of the possibility of the application of Canadian law when considering whether to execute a lease agreement with Acro Canada."

The fact that Acro generated invoices from British Columbia is not material to the analysis, because the conduct at issue is that of JLA and Linscott, not Acro. Similarly, JLA's payment of the invoices to Acro is dependent upon the actions of Acro, not

JLA. However, I conclude that JLA's conduct in shipping the turbine to British Columbia for repairs, and its later conduct in sending the turbine back to British Columbia for a determination of whether the engine was airworthy, is sufficient to constitute purposeful activity with British Columbia and its residents.

The second requirement for specific personal jurisdiction is that the claim asserted arise out of the defendant's forum related activities. Ziegler v. Indian River County, 64 F.3d 470, 474 (9th Cir. 1995). This requirement is satisfied because the claim at issue here arises from repairs made to JLA's turbine in Canada.

Even if the first two requirements are met, in order to satisfy the due process clause, the exercise of personal jurisdiction must be reasonable. Panavision, 141 F.3d at 1322; Ziegler, 64 F.3d at 474-75. For jurisdiction to be reasonable, it must comport with "fair play and substantial justice." Burger King, 471 U.S. at 476.

The question of reasonableness requires consideration of seven factors: 1) the extent of a defendant's purposeful interjection; 2) the burden on the defendant in defending in the forum; 3) the extent of conflict with the sovereignty of the defendant's state; 4) the forum state's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the controversy; 6) the importance of the forum to the plaintiff's

interest in convenient and effective relief; and 7) the existence of an alternative forum. Burger King, 471 U.S. at 476-77. No one factor is dispositive; the court must balance all seven. Panavision, 141 F.3d at 1323. Even when there is sufficient "interjection" to meet the purposeful availment prong, the degree of interjection must be weighed in assessing reasonableness. Panavision, 141 F.3d at 1323.

I conclude that, although JLA purposefully directed activities toward British Columbia and consummated a transaction there, JLA's activities in the forum are not sufficiently extensive to satisfy the reasonableness requirement of personal jurisdiction. The other reasonableness factors also weigh against the imposition of personal jurisdiction by the Canadian court. Acro does business in the United States--in fact, five of its seven regional managers are based in the United States. JLA does no business in Canada, and is a small operation situated only in Oregon. Thus the burden on JLA of litigating in Canada was greater than any burden that might have been placed on Acro by litigating in the United States.

I conclude that the most efficient judicial resolution of this controversy would be in the United States, because litigating in this jurisdiction would protect United States policy as articulated in the Act, satisfy the requirements of personal jurisdiction, and resolve the contractual dispute

17 - OPINION AND ORDER

between JLA and Acro. The importance of a Canadian forum to Acro's interest in convenient and effective relief does not weigh strongly in Acro's favor since, as noted, Acro does business in the United States and maintains five regional managers here. For that reason, too, the United States is a readily available alternative forum for Acro.

Because the assertion of personal jurisdiction over JLA by the Canadian court does not comply with the reasonableness requirement of due process jurisprudence in this country, I conclude that the conditions for recognizing the Canadian judgment in Oregon are not satisfied under the <u>Kough</u> case. Further, as discussed above, the Canadian judgment frustrates the United States' policy of protecting servicemembers during periods of active duty. Plaintiffs' motion for an order enjoining defendants from attempting to enforce the Canadian judgment is granted. Defendants' motion for summary judgment is denied.

3.   <u>Defendants' motion to strike</u>

Defendants move to strike statements made in the Affidavit of Jeffrey Linscott that on February 17, 2003, Russo directed the return of the helicopter engine to the overhaul facility and "conveyed Acro's promise of a quick turnaround and assurance that a temporary engine would not be needed." Affidavit of Jeffrey Linscott ¶ 11. Defendants assert that this statement is hearsay because Linscott was on active duty at the time and Delaney was

the employee who communicated with Russo while Linscott was on active duty. Linscott acknowledges that his statements are hearsay, but asserts that Russo's deposition confirms the facts and circumstances related to those conversations, citing Russo Deposition Exhibit 2 at 200-206.

Exhibit 2 indicates that Russo was involved in discussions about the turbine, but Exhibit 2 does not corroborate Linscott's statement that Russo promised a quick turnaround or that a temporary engine would not be needed. This portion of Linscott's affidavit is stricken because it is an apparent hearsay statement of Delaney to Linscott.

Defendants also move to strike Linscott's affidavit testimony on mechanical problems with helicopter engines, on the ground that Linscott has not established that he has training or technical knowledge sufficient to offer expert testimony. In response, Linscott has submitted a declaration, Mendelson Declaration Exhibit 1, setting out his qualifications. Defendants' motion to strike this testimony is denied.

### Conclusion

Plaintiffs' motion for preliminary injunction (doc. # 20) is GRANTED. Defendants are enjoined from registering the Canadian judgment in Oregon. Defendants' motion for summary judgment (doc.

///

///

# 27) is DENIED. Defendants' motion to strike (doc. # 25) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.


Dated this 12th of May, 2006.


/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

20  – OPINION AND ORDER